This appeal on questions of law and fact brought to this court for trial de novo an action *Page 340 
which is in form one for an injunction, but in fact is to settle a dispute that has existed since 1911 between two local lodges or divisions, as they are called, of the Order of Railway Conductors of America, a voluntary labor organization (herein referred to as the O.R.C., or the Order). A division of O.R.C. usually consists of the conductors working on an operating division of a railroad system, and their seniority district usually coincides with the operating division.
The plaintiffs are five members of division No. 481 of O.R.C. who work on the Sandusky division of the Cleveland, Cincinnati, Chicago St. Louis Railway Company system, which will be referred to by its popular name, the Big Four Railroad. That division extends from Sandusky, Ohio, through Berwick to Springfield, Ohio. The plaintiffs brought this as a class action representing themselves and all other conductors working on the Sandusky division.
The real defendants are the O.R.C. and its executive officers and Division No. 193 of O.R.C. and its executive officers. That division is composed of conductors who work on the eastern division of The Toledo Ohio Central Railroad Company system, herein called the T. O.C. That operating division extends from Toledo through Fostoria and Berwick to Thurston, Ohio.
The Big Four Railroad and the New York Central Railroad Company which, as lessee, has operated the T. O.C. system since 1922 and the Big Four since 1930, are nominal defendants. Their position is that this is a dispute within the O.R.C., the representative of all of their conductors for collective bargaining purposes, and they are willing to follow its directions or those of the courts in the employment of their conductors.
In 1911 the Big Four, by contract, acquired "trackage rights" over that part of the eastern division of *Page 341 
the T. O.C. from Berwick to Toledo, a distance of about 47.5 miles, and has since operated passenger trains over that road in connection with its Sandusky division south of Berwick. Part of the time since 1911 some of those trains have made scheduled stops to receive and discharge passengers at Fostoria and occasionally at smaller towns on that line.
Whenever Big Four trains have handled local passengers on that part of the T. O.C., the conductors of Division No. 193, and the other operating workmen — engineers, firemen and trainmen — on that division have asserted claims to a share of the work on those trains. Division No. 481 has disputed this, claiming that the T. O.C. conductors have not been deprived of any work by reason of the Big Four passenger trains handling local passengers at Fostoria and that under the constitution and statutes of the order they are not entitled to work on those trains.
In 1917, officials of the order, to whom the controversy had been referred, ruled that T. O.C. conductors should have a share of the work in question. About that time the Big Four discontinued passenger service at Fostoria, and the O.R.C. ruling was not put into effect. In 1921, when that service was resumed, the officers of O.R.C. directed that its former order be observed, and after seven months the Big Four again discontinued the service and the controversy subsided until 1929 when the T. O.C. men, claiming that some passengers were being handled at Fostoria, insisted on a share of the work as directed by the former order of O.R.C. officials. Nothing was done about this claim until 1934, when settlement of the matter by the conductors and other train and engine workmen was attempted by a contract with the Big Four entered into October 17, 1934, under the supervision of grand officers of the four brotherhoods. By it, the T. O.C. conductors were to be allowed to work on the Big Four *Page 342 
trains up to 4,500 miles each month. Thereupon the Big Four discontinued one-half of its passenger train service at Fostoria and a new dispute started as to the interpretation the contract should have under the changed conditions.
Again the grand officers of the four brotherhoods were called in and under their supervision a new contract was executed April 6, 1936, by the eight general chairmen of each of the orders on both railroad systems. By this, the T. O.C. conductors were to be permitted to work on Big Four trains up to 5,000 miles per month.
This contract being unsatisfactory to the conductors of division No. 481, they appealed to the general committee of adjustments of the O.R.C. of the Big Four system, which voted disapproval of the contract, and thereupon the matter was referred to the jurisdiction committee of O.R.C., which is composed of the president, senior vice-president, assistant to the president and two general chairmen from each of the four districts into which the United States and Canada are divided under the laws of O.R.C. It is the supreme authority within the order for the settlement of disputes. After a full hearing, this committee confirmed the disposition of the matter as made by the contract of April 6, 1936. Thereupon the plaintiff's, having exhausted their remedies within the order, filed this action, claiming that the action of the officers of the order was unreasonable, arbitrary, capricious and oppressive and in contravention of the statutes of the order and deprived them and those they represented of valuable seniority rights.
On August 15, 1935, on the application of the New York Central to the Public Utilities Commission of Ohio, it was permitted to discontinue the one passenger train a day each way it had operated over the eastern *Page 343 
division of its T. O.C. line. At that time the timetable of the N.Y.C., Sandusky division, which is in evidence, shows it was operating two trains a day each way which stopped at Fostoria and Luckey and one each way at Pemberville, and immediately following the discontinuance of the T. O.C. trains, three trains each way stopped at Fostoria.
This whole controversy turns upon the application of statute 62 of O.R.C., which plaintiff's claim was violated by the rulings of O.R.C. officers. The material part of that statute is as follows: (the lettering is added for reference purposes herein)
(a) "Whenever one railroad is absorbed or leased by another railroad the conductors on the road absorbed or leased shall retain their right and seniority as heretofore on the road absorbed or leased. When it becomes necessary to re-adjust the service of the merged roads, the trains and runs shall be manned by conductors of the respective roads in proportion, as nearly as practicable, to the mileage run on the territory of each.
(b) "Where trackage rights are hereafter granted to a foreign road, which reduces the business of the road over which trackage rights are acquired by foreign roads, a number of conductors equal to those displaced will be employed in running trains on such foreign railroads, while on the same trackage where conductors have been displaced; on the termination of trackage rights or agreements being returned, a number of men equal to the traffic returned will go with the traffic under the bulletin system provided on the line.
(c) "When differences arise between conductors on the property absorbed or leased, or where trackage rights are acquired, or where services of different railways are pooled and said differences can not be adjusted by general committees for the lines involved *Page 344 
under the provisions of this section, same will be referred by the president to the jurisdiction committee, who may decide the question without regard to this section, and whose decision thereon shall be final, without appeal, notwithstanding article 12 of the constitution."
Paragraph (a) was adopted by the grand division, or triennial convention, of O.R.C. in 1913, (b) in 1919 and (c) in 1928.
It is the contention of the plaintiffs that the ruling of the O.R.C. officers in 1917 was made on the mileage basis as provided for in paragraph (a), which was the only statute they then had to guide them; that, notwithstanding paragraph (b), adopted in 1919 specificially applied to "trackage rights" — situations like this — all later rulings of O.R.C. officers, including the contracts of 1934 and 1936 and the action of the jurisdiction committee followed the 1917 ruling using the mileage basis of (a) and not the "displaced" conductor basis as provided for in (b); and that no division No. 193 conductors were actually "displaced" by the Big Four passenger operations, hence they were not entitled to any share of the work on Big Four trains and in ruling that they were so entitled, the officers' decisions were unreasonable, arbitrary, capricious and oppressive, and in contravention of statute 62.
This contention loses sight of two considerations:
1. Some passenger business was handled by the Big Four in the area when the contracts were made and when the jurisdiction committee heard the case. No one can say now just what that passenger business might have been had the Big Four not operated therein.
The more important consideration is:
2. When the matter was heard by the jurisdiction committee, paragraph (c) of statute 62 invested that *Page 345 
body with plenary power to "decide the question without regard to this section, and whose decision thereon shall be final."
The supreme legislative authority of O.R.C. is its grand division, which meets triennially and it has power to make and amend its constitution and statutes, and all of the members of the order are bound by its action. When it adopted paragraph (c) in 1928, it had before it and knew the terms of paragraphs (a) and (b), which had been in effect and tried for ten years. It is fair to assume that the members of that body, representing as they do every division of the order, all veterans in the railroad service, recognized the complexity of situations that had arisen and would continue to arise in the practical operation of railroads, and in clear language deliberately invested its highest tribunal, the jurisdiction committee, after a hearing, with full power to use its judgment in settling disputes of this very character "where trackage rights are acquired" and to "decide the question without regard to this section (62)," and its decision is made final. In effect, it is given the power after a hearing de novo to do what it deems to be just to all parties concerned.
There is not a word in the evidence of any fact to indicate that the jurisdiction committee did not give the evidence before it full and careful consideration, or that it was prompted by any ulterior motive in the decision it made, or that any member of that body had any personal interest in either side of the controversy.
This court can not say that this body of eleven experts in conductor service abused the broad discretion with which it was clothed when it disposed of this matter as it did.
The defendants urge that, the O.R.C., being the accepted collective bargaining agency between the conductors and their employer under the Railway Labor Act, any interference by the court with the order's action *Page 346 
in that regard would be a violation of that act, and beyond the powers of the court. In view of the conclusions reached on the basic question, this is unimportant. However, it seems obvious that this dispute is one within the walls of the bargaining agent, the order, and must be settled there. When this is done, the employer stands ready to abide by that settlement, both as to whom it will employ as its conductors and their seniority rights. Until this is done, the act has no application.
The court's finding will be for the defendants on all issues, the injunction heretofore granted dissolved, and the petition dismissed at the cost of plaintiffs.
Decree accordingly.
LLOYD and STUART, JJ., concur.