**Dewey ESQUINANCE**

v.

### POLK COUNTY EDUCATION ASSOCIATION, Tennessee Education Association/NEA.

Court of Appeals of Tennessee, Western Section, at Knoxville.

June 14, 2005 Session.

July 29, 2005.

Permission to Appeal Denied by Supreme Court Jan. 30, 2006.

---

Larry L. Crain of Brentwood, Tennessee; Bruce N. Cameron of Springfield, Virginia for Appellant, Dewey Esquinance.

Richard L. Colbert and J. Christopher Anderson of Nashville, Tennessee for Appellees, Polk County Education Association and Tennessee Education Association.

Paul G. Summers, Attorney General and Reporter; Kevin Steiling, Deputy Attorney General for Intervenor/Appellee, State of Tennessee.

## OPINION

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

In this appeal, plaintiff, a teacher in the county school system, appeals the trial court's decision dismissing his complaint for failure to state a claim upon which relief can be granted. Plaintiff's complaint alleged that the educational association, as the collective bargaining agent, violated his rights to free speech, free assembly and petition, and freedom of religion set out in Tenn. Const. art. I, §§ 3, 19 and 23, and violated his due process rights under Tenn. Const. art. I, § 8. In addition, plaintiff alleged that the State of Tennessee granted the education association a monopoly in violation of Tenn. Const. art I, § 22. We affirm in part, reverse in part, and remand.

On April 24, 2003, Plaintiff, Dewey Esquinance (hereinafter "Plaintiff" or "Esquinance"), filed a complaint against Defendants, Polk County Education Association, Tennessee Education Association/NEA (hereinafter "Defendants" or "PCEA and TEA" respectively) seeking monetary, declaratory, and injunctive relief, alleging various violations of the Tennessee Constitution on the part of the Defendants. The complaint alleges that PCEA violated Plaintiff's rights to free speech, free assembly and petition, and freedom of religion under Tenn. Const. art. I, §§ 3, 19 and 23, and that PCEA violated Plaintiff's due process rights under Tenn. Const. art. I, § 8 by forcing Plaintiff to choose between "a voice and a vote" in its governmental workplace condition by having his

money used to promote abortion and homosexual rights. The complaint also alleged that the State of Tennessee granted PCEA an unconstitutional monopoly in violation of Tenn. Const. art. I, § 22.

Defendants filed an answer and motion to dismiss pursuant to Tenn.R.Civ.P. 12.02(1) and 12.02(6), and the Attorney General of Tennessee was notified pursuant to Tenn.R.Civ.P. 24.04 of the constitutional challenge to the Educational Professional Negotiations Act (hereinafter "EPNA").

After hearing arguments on December 5, 2003, the trial court granted the Defendants' motion to dismiss the first of four counts of the complaint, and the Attorney General was allowed 30 days to respond to Plaintiff's notice of the constitutional claim. On March 26, 2004, Plaintiff filed a motion to convert the Defendants' pending motion to dismiss Count V to a motion for summary judgment. Plaintiff's motion to convert Defendants' motion to dismiss to a motion for summary judgment was denied, and the court granted Defendants' motion to dismiss Count V, thereby disposing of all Plaintiff's claims and thus constituting a final order from which Plaintiff has appealed.

Plaintiff presents two issues for review:

1. Whether Mr. Esquinance has a constitutional right under the Tenn. Const., art. I, §§ 3, 8, 19, and 23, to be free from having his union dues used for purposes which conflict with his political and religious beliefs.

2. Whether representation under the collective bargaining agreement of PCEA violates the constitutional prohibition on monopolies in Tenn. Const., art. I, § 22.

We perceive the first issue to be whether the trial court erred in dismissing the complaint as to Counts I through IV for failure to state a claim upon which relief could be granted. A motion to dismiss a complaint for failure to state a claim upon which relief can be granted tests the legal sufficiency of the complaint. It admits the truth of all relevant and material allegations but asserts that such allegations do not constitute a cause of action as a matter of law. *See Riggs v. Burson,* 941 S.W.2d 44 (Tenn.1997). Obviously, when considering a motion to dismiss for failure to state a claim upon which relief can be granted, we are limited to the examination of the complaint alone. *See Wolcotts Fin. Serv., Inc. v. McReynolds,* 807 S.W.2d 708 (Tenn. Ct.App.1990). The basis for the motion is that the allegations in the complaint considered alone and taken as true are insufficient to state a claim as a matter of law. *See Cornpropst v. Sloan,* 528 S.W.2d 188 (Tenn.1975). In considering such a motion, the court should construe the complaint liberally in favor of the plaintiff, taking all the allegations of fact therein as true. *See Cook Uithoven v. Spinnaker's of Rivergate, Inc.,* 878 S.W.2d 934 (Tenn. 1994).

Plaintiff's complaint states:

This is an action under the Constitution of the State of Tennessee seeking restitution and declaratory and injunctive relief pursuant to Tenn.Code Ann. § 29–14–102; § 20–2–202; and § 16–10–101.

### PARTIES

1. Dewey Esquinance is a professional employee within the meaning of Tenn. Code Ann. § 49–5–602(11) of the Education Professional Negotiations Act ("Negotiations Act"). He is employed as a teacher by the Polk County Board of Education ("Board").

2. The Polk County Education Association/TEA/NEA ("Union") is a profes-

sional employees organization within the meaning of Tenn.Code Ann. § 49–5–602(12) of the Negotiations Act. The Union is the exclusive bargaining "representative" within the meaning of Tenn. Code Ann. § 49–5–602(13) and § 49–5–606 of the Negotiations Act for Mr. Esquinance and the other non-management professional employees in the employ of the Board. The Union's principal place of business is Polk County.

3. The Tennessee Education Association ("TEA") is also a professional employees' organization within the meaning of Tenn.Code Ann. § 49–5–602(12) of the Negotiations Act. The Union is the local affiliate of the TEA. The national affiliate of the TEA is the National Education Association.

## FACTS

4. The Board and the Union entered into a collective bargaining agreement ("Agreement") as authorized by Tenn. Code Ann. § 49–5–612 of the Negotiations Act. This agreement grants to members of the Union several special rights and privileges which include, but are not limited to:

a. All grievances must be submitted to the Union for approval before they can be filed and before they can be sent to arbitration;

b. Union members are protected from discrimination based on Union activity, but non-members are not protected from discrimination based on a decision to refrain from union activity;

c. Union officers and agents get up to 20 days to attend union conducted meetings to "improve the instruction of the school system." Nonmembers do not get similar time off work;

d. The teachers who sit on the Board's Steering Committee which sets the criteria for teacher evaluations are chosen by the Union; and,

e. The committee that controls the Board's sick bank has five members, two of whom are chosen by the Union and three by the Board. Three votes are necessary to get sick bank donations approved. Nonmembers have no voice in sick bank decisions.

5. Only Union members have a right to vote on the agreement and to sit on the employee negotiating team which presents the employee point of view in forming the Agreement.

6. Dewey Esquinance joined the Union on or about September 5, 2002, because of [sic] he wanted to have a meaningful voice and a vote in his working conditions and to avoid the discrimination contained in the Agreement against those employees who decided not to join the Union. He signed the original membership application with "moral and political objections."

7. Union dues include amounts sent to the TEA and the National Education Association. The majority of the dues amount collected by the Union is forwarded to the TEA and the National Education Association.

8. On or about January 12, 2003, Mr. Esquinance notified the Union that he objected to his Union dues being used to pay for any activities other than local negotiations, and he specifically objected to supporting the TEA and the National Education Association.

9. On or about January 22, 2003, both the Union and the TEA separately responded in writing to Mr. Esquinance. Neither the Union nor the TEA agreed to allow Mr. Esquinance to pay only for negotiations. Both stated that they could not determine this amount.

10. At approximately the same time, Mr. Esquinance requested the Board to stop deducting dues for the TEA and the National Education Association from his paycheck, and only deduct the dues for the local Union. On or about January 30, 2003, the Board notified the Union and Mr. Esquinance that it would honor Mr. Esquinance's request to limit the amount of his payroll deduction of dues.

11. On or about February 4, 2003, the Union informed Mr. Esquinance that because of his notice to stop deducting that portion of his dues that were transmitted to the TEA and the National Education Association, his Union membership was terminated.

12. Thereafter, sometime between February 4 and February 25, 2003, Mr. Esquinance sent a letter misdated January 12, 2003, which agreed to pay "under protest" the full amount of Union dues, including the amounts for the TEA and the National Education Association, so that he could retain his membership in the Union.

13. In response, the Union wrote to Mr. Esquinance on or about February 25, 2003 stating that there was "nothing to protest and no appeal process for the amount of dues paid." The Union also encouraged Mr. Esquinance to continue his Union membership so that he could "add his voice to the many members seeking the advancement of education locally . . . ."

14. Mr. Esquinance has moral, religious and political objections to paying that portion of the Union dues which will be transmitted to the TEA and the National Education Association and used for purposes other than collective bargaining activities.

15. That portion of Mr. Esquinance's dues which is transmitted to the TEA and the National Education Association will be used to promote activities to which he objects based on his moral, religious and political views. These include, but are not limited to, promoting the following:

a. abortion rights;

b. homosexual rights, including the requirement for public schools to provide sex education about "diversity of sexual orientation" and provide "domestic partner" benefits for both current and retired school employees;

c. affirmative action;

d. gun control;

e. increased levels of taxation;

f. the election of Democrats to the office of U.S. President.

These objectionable activities also include, but are not limited to, opposing the following:

g. HIV testing of school employees;

h. support for high technology weapons systems for the U.S. Military;

i. meaningful testing of teacher competency;

j. English as the official language of the United States or any state; and

k. the election of Republicans to the office of the U.S. President.

## CLAIMS FOR RELIEF

Count I (Declaration of Rights, Article I, § 19–Free Speech)

16. The allegations of paragraphs 1–15 are incorporated here by reference.

17. Under color of state law, the Union has violated the free speech rights of Mr. Esquinance by forcing him to choose between a voice and a vote in his governmental workplace conditions and supporting political, religious and ideological activities to which he objects.

Count II (Declaration of Rights, Article I, § 23–Free Assembly and Petition)

18. The allegations of paragraphs 1–15 are incorporated here by reference.

19. Under color of state law, the Union has violated the right to free assembly and free petition of Mr. Esquinance by forcing him to choose between a voice and a vote in his governmental workplace conditions and being forced to have his money used to petition the government and support organizational activities that he opposes.

Count III (Declaration of Rights, Article I, § 3–Freedom of Religion)

20. The allegations of paragraphs 1–15 are incorporated here by reference.

21. Under color of state law, the Union has interfered with Mr. Esquinance's right to freely follow the dictates of his own conscience by forcing him to choose between a voice and a vote in his governmental workplace conditions and having his money used to promote abortion and homosexual rights.

Count IV (Declaration of Rights, Article I, § 8 Due Process)

22. The allegations of paragraphs 1–15 are incorporated here by reference.

23. If this Court determines that the monopoly powers granted to the Union by state statute and Board agreement can lawfully be used to force Mr. Esquinance to choose between a voice and a vote in his governmental workplace conditions and having his constitutional rights of free speech, free association, freedom of petition and religious liberty compromised, and this common right to contract impaired, then the monopoly power (exclusive representation) conferred upon the Union by governmental action deprives him of liberty and property contrary to the law of the land.

Count V (Declaration of Rights, Article I, § 22–Monopolies prohibited)

24. The allegations of paragraphs 1–15 are incorporated here by reference.

25. If this Court determines that the monopoly powers granted to the Union by state statute and Board agreement can lawfully be used to force Mr. Esquinance to choose between a voice and a vote in his governmental workplace conditions and having his constitutional rights of free speech, free association, freedom of petition and religious liberty compromised, and this common right to contract impaired, then the monopoly power (exclusive representation) conferred upon the Union by governmental action violates the constitutional prohibition on monopolies.

PRAYER FOR RELIEF

26. Wherefore, Mr. Esquinance requests the following relief:

A. Monetary: That this Court require the Union to return to him, with interest, that portion of his dues used for purposes other than collective bargaining. This would include political, religious and ideological activities.

B. Declaratory: That this Court enter a declaratory judgment:

1) that requiring Union members to support with their dues, over their objections, the political, religious and ideological activities of the Union is unconstitutional under Article I, § § 3, 8, 19 & 23 of the Declaration of Rights;

2) that if Union members do not have the constitutional right to prevent the Union from using a portion of their dues for political, religious and ideological activities, while still retaining their right to have a vote and a voice in their workplace conditions, the governmental grant to the Union of a monopoly in representation is unconstitutional under Article I, § 22.

C.   Injunctive: That this Court enter a permanent injunction which enjoins:

1) the Union, the TEA and their agents from making or enforcing any dues demand upon members which would require them to support non-collective bargaining activities, such as political, religious and ideological activities, without their consent;

2) the Union, the TEA and their agents from making or enforcing any dues demand until such time as they establish all of the necessary pre-collection safeguards and procedures which will prevent objecting members' dues money from being used for political, religious and ideological purposes without their consent; and,

3) the Union from barring objecting members from having the right to fully participate in all matters that affect their working conditions; or, in the alternative,

4) the system of exclusive representation.

D.   Other: That the Court grant Mr. Esquinance such other and further legal or equitable relief as the Court may deem just and proper.

The controversy before us springs from the Education Professional Negotiations Act, T.C.A. § 49–5–601– § 49–5–613 (2002).  The purpose of the Act is explicitly set out in T.C.A. § 49–5–601(b):

(b) (1) It is the purpose of this part to prescribe the legitimate rights and obligations of boards of education and their professional employees and to establish procedures governing relationships between them which are designed to meet the special requirements and needs of public education.

(2) Boards of education and their professional employees have an obligation to the public to exert their full and continuing efforts to achieve the highest possible education standards in the institutions which they serve.  This requires establishment and maintenance of an educational climate and working environment which will attract and retain a highly qualified professional staff and stimulate optimum performance by such staff.

(3) Experience has shown that boards of education and their professional employees can best reach these objectives if each utilizes the ability, experience and judgment of the other in formulating policies and making decisions that involve terms and conditions of professional service and other matters of mutual concern. *It is the purpose and policy of this part, in order to protect the rights of individual employees in their relations with boards of education,* and to protect the rights of the boards of education and the public in connection with employer-employee disputes affecting education, to recognize the rights of professional employees of boards of education to form, join and assist professional employee organizations to meet, confer, consult and negotiate with boards of education over matters relating to *terms and conditions of professional service* and other matters of mutual concern through representatives of their own choosing, to engage in other activities for the purpose of establishing, maintaining, protecting and improving educational standards, and to establish procedures which will facilitate and encourage amicable settlements of disputes.

(4) *The "terms and conditions of professional service" or "working conditions" of professional employees are those fundamental matters that affect a professional employee financially or the employee's employment relationship with the board of education.*  While a board

of education is not required to agree or concede to any proposal, good faith negotiations of terms and conditions of employment or working conditions of employees shall be undertaken; provided, that no proposal may directly prevent the director of schools from transferring faculty and staff to address performance and accountability deficiencies as identified by state accountability standards. Basic education policy shall not be a mandatory subject of negotiations. "Basic education policy" shall be defined to include such things as the content of the curriculum, teaching strategies, class offerings, student placement and other things related to the policy's effect on the school system's overall ability to meet and maintain the state's student performance standards.

(5) Notwithstanding other provisions of this title to the contrary, directors of schools shall have the ultimate right to transfer all professional employees subject only to §§ 49–2–303 and 49–5–510. Nothing in this section shall be construed to make transfers or assignments mandatory subjects of negotiations.

(6) Notwithstanding any other provision to the contrary, nothing in subdivisions (b)(4)-(6) shall be construed to prevent a board of education or professional employee organization from engaging the services of qualified individuals for purposes of advice and consultation during the negotiations process. No such individual may directly serve as a negotiator as defined in § 49–5–602.

T.C.A. § 49–5–601 (2000)(emphasis added).

The Act also provides, as pertinent to the controversy before us, as follows:

(12) "Professional employees' organization" means any organization with membership *open* to professional employees, as defined in subdivision (11), in which such employees participate and which

exists for the purpose, in whole or in part, of dealing with boards of education concerning, but not limited to, grievances, wages, hours of employment or conditions of work. Such organizations may establish reasonable rules and regulations for conducting business, including provisions for the dismissal of individuals from membership.

T.C.A. § 49–5–602(12) (emphasis added).

**49–5–603. Rights of professional employees.**—Professional employees have the right to self-organization, to form, join or be assisted by organizations, to negotiate through representatives of their own choosing, and to engage in other concerted activities for the purpose of professional negotiations or other mutual aid or protection; provided, that professional employees also have the right to refrain from any or all such activities.

**49–5–605. Union recognition.**—(a) Upon the submission by one (1) or more professional employees' organizations to the appropriate local board of education between October 1 and November 1 of any year, of a request for recognition together with signed petition cards which constitute thirty percent (30%) or more of the professional employees, the board of education and the requesting employees' organization shall appoint persons to serve on a special election committee for the purpose of conducting an election as provided in subsection (b).

\* \* \*

(b)(4) A majority vote of those voting shall be required to secure representation by a professional employees' organization. Such secret ballot shall provide for a person to vote for no representation by any professional employee organization.

**49-5-606. Status of recognized unions.**—A professional employees' organization recognized pursuant to this part shall be the exclusive representative of all the professional employees employed by that board of education for the purpose of negotiating. A challenge to recognition may be made only by the board of education or another professional employees' organization as provided in § 49-5-605.

**49-5-609. Unlawful acts.**—

\* \* \*

(b) It is unlawful for a recognized professional employees' organization or its representatives to:

(1) Cause or attempt to cause a board of education to engage in conduct violative of the provisions of this part; provided, that this subdivision shall not be construed to impair the right of a professional employees' organization to prescribe its own rules with respect to operation involving the acquisition or retention of membership;

\* \* \*

In 1947, the Tennessee Legislature passed the Tennessee Open Shop Law, now codified as T.C.A. § 50-1-201- § 50-1-204, which makes it unlawful for employment to be denied to any person by reason of such "person's membership in, affiliation with, resignation from, or refusal to join or affiliate with any labor union or employee organization of any kind." T.C.A. § 50-1-201. It is also unlawful to contract providing for exclusion from employment of any person "because of membership in, affiliation with, resignation from, or refusal to join or affiliate with any labor union or employee organization of any kind." T.C.A. § 50-1-202. It is also unlawful for anyone to exclude from employment "any person by reason of such person's payment of or failure to pay dues, fees, assessments or other charges to any labor union or employee organization of any kind." T.C.A. § 50-1-203. Thus, a non-union employee has a "free ride" when considering that his dues payments conceivably benefit him in the collective bargaining on his behalf. *See Mascari v. International Brotherhood of Teamsters,* 187 Tenn. 345, 215 S.W.2d 779, 783 (1948).

■ The trial court, in dealing with the first four allegations of constitutional violations, noted that Plaintiff's failure to allege state action defeats the subject matter jurisdiction of the court, citing *Bryant v. Tenet,* 969 S.W.2d 923, 925 (Tenn.Ct. App.1997). While we agree with the trial court's statement that state action must be alleged, we disagree with the trial court's finding that there was no such allegation here. In each of the allegations of violation of constitutional provisions, Plaintiff alleges that the violations were "under color of state law." Construing the complaint liberally, as we are required to do, this statement appears to be a sufficient allegation of state action. The complaint references a dispute between Plaintiff and the Polk County Education Association, primarily concerning the use of the dues paid by Plaintiff to the association. Apparently, Plaintiff takes the position that, because the EPNA authorizes an exclusive bargaining agent and the Polk County Board of Education certified Polk County Education Association as the bargaining agent, the PCEA became a state actor. Although PCEA would be bargaining on one side of the table with the Board of Education, on the other side of the table, under the allegations in the complaint (i.e. "under color of state law"), there appears to be a question of state action involved in the dispute between Plaintiff and PCEA. The inquiry to determine state action is fact specific, and its presence is determined on a case-

by-case basis. *Chapman v. The Higbee Company,* 319 F.3d 825, 834 (6th Cir.2003)(citing *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)).

Plaintiff asserts that he is required to join the PCEA in order to have a voice in the collective bargaining made in his behalf, but his required dues payments are used partially for ideological and political agendas to which he objects. He argues that this use is contrary to holdings of the U.S. Supreme Court in cases such as *Abood v. Detroit Bd. of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).

PCEA, on the other hand, points out that *Abood* and the other cases relied upon by Plaintiff involve union shops or agency shops where fees imposed on the employees are conditioned upon continuing employment. The Court held in those cases that the employees have a constitutional right to object to the expenditures of a portion of their dues for ideological or political agendas.

We see no need to prolong this opinion by going into cases relied upon by each side of this controversy, because, as stated in *Abood:* "The National Labor Relations Act leaves regulation of the labor relations of state and local governments to the states." 431 U.S. at 223, 97 S.Ct. at 1793; *see also* 29 U.S.C., § 152(2).

PCEA asserts that Plaintiff has no constitutional right to join the union. We must respectfully disagree, because T.C.A. § 49–5–602(12) specifically provides that "'professional employees' organization' means any organization with membership *open* to professional employees." (Emphasis added). If the membership was not open to Plaintiff, and others in like position, the organization could not be a "professional employee organization" qualified to be a bargaining agent.

Like the trial court, we will consider the case under the declaratory judgment act, § 29–14–103 (2000), which provides:

**29–14–103. Construction of statutes and written instruments.**—Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status or other legal relations thereunder.

The trial court, in its memorandum opinion concerning the first four constitutional violations alleged, alluded to nonviolation of constitutional rights as the failure to state a claim upon which relief can be granted. We believe, however, that the complaint, though premised on state constitutional violations, could also be construed to allege other wrongs against Plaintiff upon which relief can be granted.

■ For instance, the complaint alleges that Plaintiff pays his dues but protested the use of a portion of his dues for contributions to TEA and NEA, and that this portion of his dues could be used or were used for various and sundry things that he was personally opposed to. The crux of his complaint is that his dues were being used in violation of his personal rights.

Defendants correctly assert that generally the courts will not intervene in the internal affairs of voluntary association, such as PCEA. We do not disagree with this statement; however, there are exceptions to the rule. In 6 Am.Jur.2d Associations and Clubs § 29, it is stated:

The general rule that courts will not intervene in the internal affairs of a

voluntary association or club is subject to exception where the private rights of members are involved, it being generally recognized that judicial aid may be sought in case of actual or threatened invasion of the property or pecuniary rights of members. It has been held in this respect that the deprivation of pecuniary benefits resulting from binding contractual relations involves the question of due process of law. Membership in certain types of voluntary associations may affect the member's right to pursue a trade or profession, and where this is the case, judicial intervention may be sought to protect the member's pecuniary or property right in membership. Injunctive relief may be sought against an anticipated violation of the rules of a voluntary incorporated association by its officers which threatens irreparable injury to a member for which there is no adequate and complete remedy at law. However, a court, acting in equity, has no authority to interfere with the actions of voluntary, unincorporated associations where no property rights are involved.

In *Coke v. United Transportation Union,* 552 S.W.2d 402 (Tenn.Ct.App.1977), a union-member plaintiff sued the union stating deprivation of financial benefits of his office. The trial court granted summary judgment, and this Court reversed, holding that the court could intervene in the union's affairs under the circumstances presented and said:

As stated in the Chancellor's opinion, the courts may intervene where the union's own procedures have not been followed or the union and/or its officers act in an otherwise arbitrary, oppressive or unlawful manner. In *Hennekes v. Maupin* (1963), 119 Ohio App. 9, 192 N.E.2d 204, and *Boblitt et al. v. Cleveland, Cincinnati and St. L. Ry. Co.* (1943), 73 Ohio App. 339, 56 N.E.2d 348, the defendants-unions were dismissed, but the Ohio Court recognized the principle just stated.

The same principle is also recognized in the Tennessee cases of *Tennessee Secondary School Athletic Association v. Cox,* 221 Tenn. 164, 425 S.W.2d 597 (1968), and *Murray v. Supreme Hive L.O.T.M.,* 112 Tenn. 664, 80 S.W. 827 (1904).

*Id.* at 405. To the same effect, see *Dowdy v. Alexander,* 51 S.W.3d 200, 206 (Tenn.Ct. App.2000).

The EPNA describes the purpose and policy of the Act, and it seems to this Court that the authority for a collective bargaining organization is for the purpose of a relationship of the various employees with the board of education, and it could be interpreted to mean that a voluntary donation of a portion of the dues collected from the employees exceeds the authority granted. Moreover, the facts must be developed to determine whether Polk County Education Association is acting under color of state law. Therefore, giving the complaint its liberal construction, as we are required to do, we find that the complaint, as to the first four counts thereof, states a cause of action upon which relief can be granted, and the case should be remanded for further proceedings

## COUNT V

Count V appears to be an alternative claim, but it is unclear whether it becomes operative by virtue of the court's disposition of Counts I through IV. Therefore, we will address this count.

■■■ In Count V, Plaintiff asserts that the provisions of the EPNA providing for the recognition of a single professional employee organization as the representative of all of the professional employees in the school system for the purposes of collective bargaining constitutes an unlawful

monopoly in violation of Tenn. Const. art. I, § 22, which states:

**Sec. 22. No perpetuities or monopolies.**—That perpetuities and monopolies are contrary to the genius of a free State, and shall not be allowed.

In evaluating the constitutionality of a statute, we begin with the presumption that an act of the legislature is constitutional. Due to this strong presumption, the party attacking the constitutionality of a statute must bear a heavy burden in establishing some constitutional infirmity of the act in question. *See Gallaher v. Elam,* 104 S.W.3d 455, 459 (Tenn.2003). The court is required to indulge every presumption and resolve every doubt in favor of the statute's constitutionality. *See State v. Taylor,* 70 S.W.3d 717, 721 (Tenn. 2002). The court has "a duty to adopt a construction which will sustain a statute and avoid constitutional conflict any reasonable construction exists...." *See State v. Sliger,* 846 S.W.2d 262, 263 (Tenn.1993).

In *Leeper v. State,* 103 Tenn. 500, 53 S.W. 962 (1899), our Supreme Court held that the "Uniform Text–Book Act," which authorized the commission appointed by the governor to select a series of textbooks for public schools and to contract with a publisher to furnish the books did not create an unlawful monopoly prohibited by the constitution. The Court said:

It is not insisted that the intention or operation of this Act is to confer a pecuniary benefit on the State or school officials or publishers. On the contrary, its evident purpose is to confer a benefit upon the public by providing ways and means by which books may not only be made uniform throughout the State, but also furnished to the public at as small cost as possible. If a privilege thus conferred upon an individual, the object of which is to benefit the State and its citizens, can be termed a monopoly, it is

certainly not of that class prohibited by the Constitution, which refers to privileges granted for a money consideration, or which are bestowed upon an individual for his benefit. The monopoly prohibited by the Constitution is a privilege farmed out to the highest bidder, or conferred because of favoritism to the donee, and not one awarded to the lowest bidder and for the convenience and benefit of the public.

*Id.* at 518–19, 53 S.W. 962.

In *Checker Cab Co. v. City of Johnson City,* 187 Tenn. 622, 216 S.W.2d 335 (1948), although finding that a monopoly was created in that case, the Court noted that the anti-monopoly clause of the state's constitution does not prohibit the legislature from granting a monopoly if such monopoly "has a reasonable tendency to aid in the promotion of the health, safety, morals and well-being of the people." *Id.* at 337 (citations omitted).

In *Dial–A–Page, Inc. v. Bissell,* 823 S.W.2d 202 (Tenn.Ct.App.1991), the Court said:

The test for determining whether the legislature has correctly exercised its police power in regulating an activity is the rational basis test. If the legislature concludes that there is a reasonable basis for the regulatory statute and if there is some foundation in fact to justify the legislature's conclusion, then the court is powerless and may not substitute its judgment for that of the legislature. *See Chapdelaine v. Tennessee State Bd. of Examiners,* 541 S.W.2d 786 (Tenn.1976) *appeal dismissed,* 429 U.S. 1033, 97 S.Ct. 724, 50 L.Ed.2d 744 (1977).

*Id.* at 206–207.

█ The purpose and policy of the EPNA is clearly for the promotion of the welfare and benefit of the students, teach-

ers, and the public as a whole. Under these circumstances, there was no monopoly created allowing the collective bargaining as provided in the statute. Accordingly, the order of the trial court dismissing Count V of the complaint is affirmed.

In sum, the order of the trial court is affirmed in part, reversed in part, and the case is remanded to the trial court for further proceedings as heretofore noted consistent with this Opinion. Costs of the appeal are assessed one-half to Appellant, Dewey Esquinance, and his surety, and one-half to Appellee, Polk County Education Association.