# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE
### August 15, 2017 Session

## RACHEL ANDERSON, ET AL. v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TN

**Appeal from the Circuit Court for Davidson County**
**No. 15C3212 Kelvin D. Jones, Judge**

_____

### No. M2017-00190-COA-R3-CV

_____

This case involves various issues related to an ordinance the Metropolitan Government of Nashville and Davidson County enacted to address short-term rental properties. Among other things, the enacted ordinance provided that no more than 3% of non-owner-occupied single-family or two-family residential units would be granted short-term rental permits in each census tract. The plaintiffs, who previously listed their home on Airbnb.com, filed suit against the Metropolitan Government challenging the enforceability of the ordinance on several fronts. In addition to asserting that the enacted ordinance was unconstitutionally vague, the plaintiffs contended that the 3% cap on certain short-term rentals was an unlawful monopoly. After competing motions for summary judgment were filed, the trial court held that the definition of a "short-term rental property" was unconstitutionally vague as-applied to the plaintiffs, but it also held that the 3% cap did not constitute a monopoly. Given the plaintiffs' success on their constitutional "vagueness" claim, the trial court found them to be prevailing parties under 42 U.S.C. § 1988 and awarded them certain attorney's fees. On appeal, both sides raise issues asserting error. Because several definitions contained within the governmental ordinance have been amended since the filing of this appeal, we conclude that the plaintiffs' constitutional "vagueness" claim is now moot. Concerning the propriety of the 3% cap on non-owner-occupied short-term rentals, we have determined that the cap is constitutionally permissible even assuming that it constitutes a monopoly. For reasons discussed herein, we vacate the award of attorney's fees and remand the issue for reconsideration.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Vacated in Part and Remanded

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which BRANDON O. GIBSON and KENNY ARMSTRONG, JJ., joined.

Lora Barkenbus Fox and Catherine J. Pham, Nashville, Tennessee, for the appellant, Metropolitan Government of Nashville & Davidson Co.

Braden H. Boucek, Nashville, Tennessee, for the appellees, Rachel Anderson, and P. J. Anderson.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

Rachel and P.J. Anderson ("the Andersons") moved from Chicago to Nashville in August 2013 due to Mr. Anderson's career as an aspiring musician. The couple bought a home in the Germantown neighborhood of Nashville and began listing their home on Airbnb.com in the fall of that year.

In 2014, the Metropolitan Council, the legislative body for the Metropolitan Government of Nashville and Davidson County ("Metro"), began debating laws to address short-term rental properties. This process resulted in the passage of two ordinances in February 2015, Substitute Ordinance No. BL2014-909 and Ordinance No. BL2014-951. Under the ordinances, a "Short Term Rental Property," or "STRP," was defined to mean "a residential dwelling unit containing not more than four sleeping rooms that is used and/or advertised for rent for transient occupancy by guests as those terms are defined in Section 5.12.010 of the metropolitan code." Substitute Ordinance No. BL2014-909; Ordinance No. BL2014-951. The ordinances also specifically stated that "[r]esidential dwelling units rented to the same occupant for more than 30 continuous days, Bed and Breakfast establishments, boarding houses, hotels, and motels shall not be considered Short Term Rental Property." Substitute Ordinance No. BL2014-909; Ordinance No. BL2014-951. The primary ordinance implicated in this appeal, Ordinance No. BL2014-951, imposed a number of requirements and restrictions on homeowners seeking to operate a STRP. Among other things, it required operators of a STRP to obtain a permit, to obtain proof of liability insurance coverage, and to obey certain fire safety requirements. Ordinance No. BL2014-951. Advertising restrictions were also implemented. First, homeowners were prohibited from advertising their property for use as a STRP without having first obtained a permit. *Id.* However, even with a permit, homeowners were not allowed to display signs or other advertising on the property indicating that the dwelling unit was being utilized as a STRP. *Id.*

As is of particular relevance to this appeal, Ordinance No. BL2014-951 also placed a limit on the number of *non-owner-occupied* STRPs allowed. Specifically, it provided that no more than 3% of the single-family or two-family residential units within each census tract shall be permitted as non-owner-occupied STRPs. *Id.* No limitation was implemented regarding the overall number of owner-occupied STRPs.

The Andersons obtained an *owner-occupied* permit in June 2015, and the following month, enforcement of the ordinances began. At the time they obtained their owner-occupied permit, the Andersons had no intention of moving from Nashville. However, things soon changed. After the Andersons obtained their permit, Mrs. Anderson's employer proposed promoting her to an executive level position. The opportunity was appealing and offered several benefits, but in order to take the position, the Andersons would have to move back to Chicago.

For various reasons, the Andersons decided that they would like to move but still keep their home in Nashville. Because they also desired to continue offering short-term rentals of their Nashville home, they intended to convert their STRP permit from an owner-occupied permit to a non-owner-occupied permit. Although Mr. Anderson attempted to get a non-owner-occupied permit on August 19, 2015, his efforts proved unsuccessful. Because the 3% cap on non-owner-occupied permits had already been reached in the Andersons' census tract, the request for a permit was denied.

The present litigation commenced shortly thereafter on August 26, 2015, when the Andersons filed suit against Metro in the Davidson County Circuit Court. The suit was brought in part under 42 U.S.C. § 1983 and asserted several claims, nearly all of which alleged constitutional infirmities with portions of the Metro Code. Most of the raised concerns related to alleged invalidity of Ordinance No. BL2014-951 (the "STRP ordinance"). First, the Andersons contended that there was an overlap between the definitions for hotels, bed and breakfast establishments, and boardinghouses, which were exempt from the STRP ordinance, and the definition for STRPs. Assuming they were not determined to be exempt from Metro's new STRP ordinance, the Andersons alleged that the ordinance must be deemed unconstitutionally vague when measured against the due process clause of the Fourteenth Amendment to the federal Constitution and Article 1, Section 8 of the Tennessee Constitution. The Andersons also raised state and federal constitutional claims with respect to the advertising restrictions contained in the STRP ordinance. According to the Andersons, the advertising restrictions unlawfully abridged their free speech rights.

The Andersons' attack on the new STRP ordinance was not limited to advertising and definitional concerns but also included challenges to the 3% cap. According to the Andersons, the 3% cap on non-owner-occupied STRPs violated equal protection, was a substantive due process violation, and was an unlawful monopoly in violation of Article 1, Section 22 of the Tennessee Constitution.[1] In specific regards to their anti-monopoly claim, the Andersons contended that the cap had "no legitimate relation to any valid public purpose."

---

[1] The equal protection and substantive due process challenges to the 3% cap are not at issue in this appeal.

In addition to contesting the validity of the new STRP ordinance, the Andersons took issue with another Metro ordinance codified at Metro Code § 6.28.010, which required every person "engaged in the business of lodging transients" to keep a register of its guests and to show such register to the police upon written request. According to the Andersons, this requirement ran afoul of Article 1, Section 7 of the Tennessee Constitution and the Fourth Amendment to the federal Constitution. In requesting relief stemming from the aforementioned claims, the complaint sought declaratory relief, injunctive relief, and the recovery of attorney's fees pursuant to 42 U.S.C. § 1988.

In September 2015, the Andersons filed a motion for a preliminary injunction concerning a minority of the claims they had asserted in their complaint, and in October 2015, Metro filed a motion to dismiss the lawsuit. Both motions were heard by the trial court on October 30, 2015, and later resolved in a series of orders entered on November 12, 2015. The trial court's November 12 orders granted partial relief to both sides. In finding that the Andersons were likely to succeed on the merits of their free speech and search and seizure claims, the trial court entered an injunction "prohibiting enforcement of either the prohibition on STRP signage or the obligation to keep and surrender guest records." The Andersons' substantive due process claim, however, was dismissed.

The parties' dispute over the Andersons' free speech and search and seizure claims hinged, in part, on the applicability of the United States Supreme Court's decisions in *Reed v. Town of Gilbert*, -- U.S. ---, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015), and *City of Los Angeles v. Patel*, -- U.S. ---, 135 S. Ct. 2443, 192 L. Ed. 2d 435 (2015). Whereas the Andersons suggested that these decisions strongly casted doubt on the constitutionality of the prohibition on signage included in the STRP ordinance and the requirement to surrender guest records codified at Metro Code § 6.28.010, Metro initially disclaimed this notion. In 2016, however, Metro took steps to amend the ordinances related to the Andersons' free speech and search and seizure claims, citing both *Reed* and *Patel* as a basis for its action.

The first change that occurred was in relation to the requirements contained in Metro Code § 6.28.010. As previously noted, that section mandated that those "engaged in the business of lodging transients" must show a register of its guests to the police upon written request. As amended in May 2016 by Ordinance No. BL2016-177, Metro Code § 6.28.010 now includes the following provision:

> If inspection of the book or register is refused, the operator, manager, or person in charge shall secure the book or register in the manner required by the requesting police officer, so that its contents are preserved. The book or register shall be kept in the secured location until such time as an administrative or judicial search warrant, subpoena, or order can be granted or denied, and any appeal resolved.

Subsequent to the amendment of Metro Code § 6.28.010, an ordinance was introduced in July 2016 to amend the ban on advertising included within the STRP ordinance. Specifically, the ordinance proposed deleting Metro Code § 6.28.030.E, which had prohibited homeowners from displaying STRP advertising on their property, and replacing it with the following language: "Signage. Any sign, as defined in M.C.L. 17.32.030.B, on a property used as a short term rental property shall be governed by the provision of M.C.L[.] Chapter 17.32 Sign Regulations." The ordinance passed its second reading on August 2, 2016.

In light of the changes to Metro Code § 6.28.010 and the impending changes to Metro Code § 6.28.030.E, Metro filed a motion on August 12, 2016 to dissolve the preliminary injunction that had been granted by the trial court and to dismiss the Andersons' free speech and search and seizure claims. According to Metro, the Andersons' free speech and search and seizure claims were rendered moot by the changes (and imminent changes) to the Metro Code. On August 17, 2016, subsequent to the filing of Metro's motion, the ordinance amending the STRP advertising restrictions was finally approved. The following week, on August 25, 2016, the trial court entered an agreed order dismissing the Andersons' free speech and search and seizure claims as moot. Incident to its dismissal of these claims, the trial court dissolved its preliminary injunction.

Following the dissolution of the preliminary injunction, four primary claims remained pending in the trial court: (1) the Andersons' claim for an exemption under the STRP ordinance; (2) the constitutional "vagueness" claim; (3) the equal protection claim; and (4) the anti-monopoly claim. These claims were subsequently the center of competing motions for summary judgment, and on October 28, 2016, the trial court entered an order with respect to each side's request for summary judgment. Although the trial court concluded that the "STRP" definition was unconstitutionally vague as had been argued by the Andersons, it granted Metro's motion for summary judgment with respect to the Andersons' equal protection and anti-monopoly claims.[2] The trial court later amended its October 28 order by clarifying that the STRP definition was unconstitutionally vague "as-applied" to the Andersons, and in an order entered on January 23, 2017, awarded the Andersons over $100,000.00 in attorney's fees. This appeal followed.

**ISSUES PRESENTED**

Collectively, the parties' principal appellate briefs raise the following issues:

---

[2] The trial court held that it could not conclude whether or not the Andersons' property was exempt from the STRP ordinance given its determination that the STRP definition was unconstitutionally vague.

1.  Did the trial court err in determining that the STRP definition was unconstitutionally vague?

2.  Did the trial court err in failing to conclude that the 3% cap represented an unlawful monopoly?

3.  Did the trial court err in awarding attorney's fees and costs to the Andersons based on its "vagueness" ruling?

4.  Did the trial court err in concluding that the Andersons only prevailed on their constitutional "vagueness" claim?

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Robinson v. Baptist Mem'l Hosp.*, 464 S.W.3d 599, 606 (Tenn. Ct. App. 2014) (citations omitted). "The resolution of a motion for summary judgment is a matter of law, which we review *de novo* with no presumption of correctness." *Id.* at 607 (citing *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008)). In general, an award of attorney's fees will be reversed or altered only if the trial court has abused its discretion. *Sunburst Bank v. Patterson*, 971 S.W.2d 1, 7 (Tenn. Ct. App. 1997) (citations omitted). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted).

## DISCUSSION

### *The Andersons' Constitutional "Vagueness" Claim*

Throughout the entirety of this litigation, the Andersons' constitutional "vagueness" claim has been predicated on the notion that Metro's definition of a "STRP" overlaps with specified uses that are themselves exempted from the reach of the STRP ordinance. In developing this point at summary judgment, the Andersons argued as follows:

> The problem begins with the STRP law's effort to exempt other entities that house transients. An STRP is defined as a residential dwelling unit containing not more than four (4) sleeping rooms that is used and advertised for rent for transient occupancy by guests as those terms are defined in the Hotel Occupancy Tax ordinance (Section 5.12.010). Metro Code § 6.28.030(A). The STRP ordinance provides that bed and breakfast

establishments, boardinghouses, hotels, and motels shall not be considered short-term rental property, and are thus not governed by the law.

. . . .

In many instances, these terms will overlap.

. . . .

[For example,] the Andersons' home fits the definition of a hotel. *See* Metro Code § 5.12.10. Their home is a structure. They furnish accommodations to transients for a consideration. Their home is occupied and intended for occupancy by transients for dwelling, lodging or sleeping purposes. While their home is a residential dwelling unit, an element of an STRP, the hotel definition *does not* exclude residences from the definition.

. . . .

There is no clear line of demarcation between these terms. An STRP may at once be an STRP and governed by the law, or a hotel/boardinghouse/bed and breakfast, and not. The ordinance collapses into a hopeless mess that either exempts the Andersons or must be voided as vague and unenforceable.

Although the trial court ultimately agreed with the Andersons on this issue and concluded that the "STRP" definition was unconstitutionally vague as-applied to them, Metro argues that this determination was in error. On appeal, it asks us to reverse the trial court's conclusion on this issue. Although the Andersons argue in response that the trial court's conclusion regarding "vagueness" was proper, we will not address the constitutional "vagueness" issue. It is apparent to us that the matter is no longer justiciable.

Tennessee courts have limited their role to deciding "legal controversies." *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 203 (Tenn. 2009) (citation omitted). A proceeding involves a "legal controversy" when the disputed issue is real and existing, as opposed to theoretical or abstract. *Id.* (citations omitted). Justiciability doctrines assist the courts in determining whether a particular case presents a legal controversy. *Id.* Among the many justiciability doctrines that exist, the mootness doctrine is at issue here. Although the doctrines of standing and ripeness "focus on the suit's birth, the doctrine of mootness focuses attention on the suit's death." *Id.* at 204 (citation omitted). Importantly, "[a] case must remain justiciable (remain a legal controversy) from the time it is filed until the moment of final appellate disposition." *Id.*

- 7 -

at 203-04 (citations omitted). A case can become moot, and therefore lose justiciability, "either by court decision, acts of the parties, or some other reason occurring after commencement of the case." *Id.* at 204 (citations omitted). If a case no longer serves as a means to provide some sort of judicial relief, it will be considered moot. *Id.* (citations omitted).

Here, the record reflects that Metro passed a new ordinance to deal with the STRP definition after the trial court declared the prior ordinance unconstitutional. Specifically, subsequent to the filing of notices of appeal in this case, Metro approved Substitute Ordinance No. BL2016-492.

In pertinent part, the new ordinance deletes the previous definition of "Short Term Rental Property" and replaces it with a new one. Under the new ordinance, a STRP "means a residential dwelling unit containing not more than four sleeping rooms that is used and/or advertised only through an online marketplace for rent for transient occupancy by guests." Notably, unlike the old definition, the new definition does not pose the issue complained about by the Andersons. That is, it does not state that bed and breakfast establishments, boarding houses, hotels, and motels shall not be considered "Short Term Rental Property." In any event, the new ordinance also provides new definitions for "Hotel," "Bed and breakfast inn," and "Boarding house."

Because the Andersons' constitutional "vagueness" claim relates to a definition that is no longer in place, our inquiry into the matter would not be an inquiry into a "legal controversy." The issue is a moot one. As such, we decline to address the matter. *See City of Memphis v. Hargett*, 414 S.W.3d 88, 97 (Tenn. 2013) ("[T]he Plaintiffs' claims concerning the library photo ID cards are premised upon the construction of a provision that is no longer in force. Because the amended version of the Act will govern future elections, a judgment granting the Plaintiffs the interpretation they seek would not provide any meaningful relief.").

### *Monopoly Issue/Validity of the 3% Cap*

Notwithstanding the definitional amendments that have mooted the constitutional "vagueness" issue, we are of the opinion that the validity of the 3% cap remains a live controversy because the new ordinance, Substitute Ordinance No. BL2016-492, also provides that "[n]o more than three percent of the single-family or two-family residential units within each census tract shall be permitted as . . . non-owner-occupied short-term rental use."[3] According to the Andersons, the 3% cap represents an unconstitutional monopoly. For the reasons set forth below, we disagree.

---

[3] The ordinance originally providing for a 3% cap, Ordinance No. BL2014-951, had implemented the 3% cap by adding a new section to the Metropolitan Code. That section, section 6.28.030, was deleted in its entirety by Substitute Ordinance No. BL2016-492. Under the new ordinance, the 3% cap and the new definitions regarding homesharing were placed under Title 17 of the Metropolitan Code.

Article 1, Section 22 of our State Constitution provides that "monopolies are contrary to the genius of a free State, and shall not be allowed." A monopoly has been defined to mean "an exclusive right granted to a few, which was previously a common right." *City of Watauga v. City of Johnson City*, 589 S.W.2d 901, 904 (Tenn. 1979). "If there is no common right in existence prior to the granting of the privilege for franchise, the grant is not a monopoly." *Id.* (citations omitted). Importantly, whether a legislative enactment grants a monopoly is not ultimately dispositive of whether that enactment is constitutional. Despite our Constitution's anti-monopoly clause, it is clear that not all monopolies are unlawful.

In general, a monopoly is permitted when it is directed toward the public good. *See Leeper v. State*, 53 S.W. 962, 965 (Tenn. 1899) ("If a privilege thus conferred upon an individual, the object of which is to benefit the state and its citizens, can be termed a 'monopoly,' it is certainly not of that class prohibited by the constitution, which refers to privileges granted for a money consideration, or which are bestowed upon an individual for his benefit."). In fact, it is "settled law that the anti-monopoly clause of our constitution does not prohibit the legislature from granting a monopoly, in so far as such monopoly has a reasonable tendency to aid in the promotion of the health, safety, morals and well being of the people." *Checker Cab Co. v. City of Johnson City*, 216 S.W.2d 335, 337 (Tenn. 1948). In other words, "[i]f in the exercise of . . . [the] police power an incidental monopoly happens to be created, it is not one which offends the anti-monopoly clause of our Constitution." *Landman v. Kizer*, 255 S.W.2d 6, 7 (Tenn. 1953) (citation omitted).

Although there is some suggestion by the Andersons on appeal that the police power cannot justify a monopoly, we are of the opinion that their position is in error. While it is true that our Supreme Court has stated that a "monopoly cannot be validly created merely by connecting such creation with the exercise of a police power," *Checker Cab Co.*, 216 S.W.2d at 337, we understand this to mean that a government's invocation of the police power should not be blindly accepted by the courts. That is, the professed justification for a monopoly is not acceptable merely because it is ostensibly connected to the police power; the monopoly must actually bear a legitimate relation to the public purposes sought to be accomplished. *Id.* ("[I]f the monopoly created has a legitimate relation to the public purpose sought to be accomplished in the exercise of the police power, then a Court is without authority to determine such monopoly invalid on the theory that it thinks some other method would have accomplished the purpose sought."). As the previously-cited *Landman* decision instructs, a monopoly created through the exercise of the police power is permitted "if the actual and real tendency of such ordinance or statute is to effect the purpose of protecting the safety, health and morals of the public." *Landman*, 255 S.W.2d at 7 (citation omitted).

In advocating for a higher standard of review than is actually provided by the relevant Tennessee decisions on this issue, the Andersons argue that whereas police

powers may be a basis to promote a public's "health, safety, morals, or *welfare*,"[4] the accepted justifications for a monopoly are not as broad. Specifically, by citing *Checker Cab*, the Andersons contend as follows: "[M]onopolies must 'aid in the promotion of health, safety, morals and well being of the people.' . . . Conspicuously absent from this list is one highly general category – welfare. That is a significant omission." In our opinion, this argument lacks merit. As Metro argued in the trial court, "welfare and well-being are synonymous terms." Indeed, the first entry for "welfare" in Black's Law Dictionary defines the term as "[w]ell-being in any respect." Black's Law Dictionary 1625 (8th ed. 2004). Contrary to the Andersons' argument, there is simply no meaningful distinction between the public's "health, safety, morals, and welfare" and the public's "health, safety, morals, and well-being."[5]

No doubt, the Andersons' attempt to parse the language from *Checker Cab* is tied to their attempt to place the relevant standard of review as involving something more than an inquiry into whether the police power was properly exercised. The case law clearly indicates, however, that the scope of judicial inquiry is tied to scrutinizing whether the police power is a proper basis for the enacted monopoly. As the Supreme Court has stated, "[t]he courts [must] decide . . . whether [the law] has any real tendency to carry into effect the purposes designed—that is, the protection of the public safety, the public health, or the public morals—and whether that is really the end had in view." *Checker Cab Co.*, 216 S.W.2d at 337 (quoting *Motlow v. State*, 145 S.W. 177, 188 (Tenn. 1912)).

In light of certain arguments advanced by the Andersons on appeal,[6] we are compelled to note that the relevant judicial considerations under this test do not involve an inquiry into the motivations or "true purpose" behind the ordinance. Although the Andersons suggest that the "end . . . in view" language from *Checker Cab* requires such an inquiry, we respectfully disagree. In our opinion, although courts are certainly required to determine whether a monopoly bears a legitimate relation to valid end goals,

---

[4] *See City of Knoxville v. Knoxville Water Co.*, 64 S.W. 1075, 1085 (Tenn. 1901) (noting that the "public health, the public morals, the public safety, and the general and comprehensive clause of the public welfare" have been embraced as within the scope of the police powers).

[5] "Welfare" and "well-being" are clearly interchangeable, as is evidenced by judicial articulations of the police power. *Compare Knoxville Water Co.*, 64 S.W. at 1085 (noting that the "public health, the public morals, the public safety, and the general and comprehensive clause of the public welfare" have been embraced as within the scope of the police powers), *with City of Norris v. Bradford*, 321 S.W.2d 543, 546 (Tenn. 1958) ("The police power inherent in the sovereign is born of necessity for the protection and advancement of the public safety, health, morals and natural well being of its people."). Moreover, although the Andersons suggest "welfare" is not a permissible consideration for a monopoly, we observe that one Supreme Court decision specifically uses that term. *See Landman*, 255 S.W.2d at 7 (referring to "welfare of the people" in the context of a review under the anti-monopoly clause).

[6] The Andersons express concern that the true purpose of the 3% cap was economic protectionism in favor of the "traditional hospitality sector."

- 10 -

or public purposes, this does not require a review of a legislature's actual subjective motivations, assuming such motivations could actually be divined. In reaching this conclusion, we observe that the language relied upon by the Andersons from *Checker Cab* is taken from *Motlow v. State*, 145 S.W. 177 (Tenn. 1912). This is noteworthy because in a number of other decisions in which the *Motlow* language has been quoted, Tennessee courts, including our Supreme Court, have indicated that the "motives" of the legislative body are not considered. *See Davidson Cnty. v. Rogers*, 198 S.W.2d 812, 814-15 (Tenn. 1947) (quoting the *Motlow* language and later stating that "[n]either the 'motives' of the County Court . . . nor the methods . . . are subject to . . . review"); *Fiser v. City of Knoxville*, 584 S.W.2d 659, 662 (Tenn. Ct. App. 1979) (quoting the *Motlow* language and later stating that the Supreme Court has rejected attempts to explore motives behind the enactment of zoning ordinances); and *Mobile Home City of Chattanooga v. Hamilton Cnty.*, 552 S.W.2d 86, 87-88 (Tenn. Ct. App. 1976) (quoting the *Motlow* language and later stating that "[n]either the 'motives' of the County Court . . . nor the methods . . . are subject to . . . review"). If the "end . . . in view" language from *Motlow/Checker Cab* required the motive inquiry suggested by the Andersons, the pronouncements in these other cases would be irreconcilable.

In view of the foregoing understandings regarding the scope of judicial review, we can now specifically turn to the validity of the 3% cap. First, does the 3% cap represent a monopoly? If so, does it have a reasonable tendency to aid in the promotion of the public's health, safety, morals, or well-being?

The first question—whether the 3% cap is a monopoly—is vigorously disputed on appeal. As previously noted, a monopoly is "an exclusive right granted to a few, which was previously a common right." *City of Watauga*, 589 S.W.2d at 904. In its order dismissing the Andersons' anti-monopoly claim, the trial court held that the 3% cap did not constitute a monopoly because a "residential property owner's ability to operate a non-owner-occupied STRP was not a common right before the passage of the ordinance in question." Metro contends that this conclusion was correct and submits that prior to the passage of the STRP ordinances, the housing of transients was not legally allowed in residential neighborhoods save for those operating a boarding house. It is unclear to us how Metro's argument on this point should prevail. At summary judgment, Metro did not dispute that its Zoning Administrator had written an opinion in October 2014 stating that his department had construed STRPs to be an incidental subordinate use to a principal residential use. Moreover, in a sworn interrogatory response, Metro expressly stated that "STRPs were not a Codes violation prior to the passage of the ordinance."

Metro also argues that no monopoly is implicated because there is no exclusive right that has been granted to a few. In advancing this point, it seems to suggest that because permits are potentially available in each census district, this defeats the notion that a monopoly has been established. We are not persuaded by this argument because the cap at issue, in effect, enacts a monopoly within each census tract. As the Andersons

have pointed out in their reply brief, the definition of a monopoly recognizes that monopolies exist "within a community or district." *Trails End Campground, LLC v. Brimstone Recreation, LLC*, No. E2014-00336-COA-R3-CV, 2015 WL 388313, at *9 (Tenn. Ct. App. Jan. 29, 2015) (quoting Black's Law Dictionary (9th ed. 2009) (quoting 54A Am. Jur. 2d *Monopolies, Restraints of Trade, and Unfair Trade Practices* § 781 (1996))).

In any event, our recognition of the 3% cap as a monopoly is not dispositive in answering whether the cap is constitutionally infirm.[7]  As previously indicated, not all monopolies are unlawful.  "If in the exercise of . . . [the] police power an incidental monopoly happens to be created, it is not one which offends the anti-monopoly clause of our Constitution, if the actual and real tendency of such ordinance or statute is to effect the purpose of protecting the safety, health and morals of the public." *Landman*, 255 S.W.2d at 7 (citation omitted).[8]  Our Constitution simply does not prohibit monopolies that bear a legitimate relation to such purposes and the public well-being. *Checker Cab Co.*, 216 S.W.2d at 337 (citations omitted).

When Metro passed the STRP ordinances under discussion herein, it professed that the needs of long-term residents should be balanced with the allowance of short-term rentals.[9]  As is evident from the parties' briefs, the articulated concern with respect to Metro's long-term residents is the protection of residential character in neighborhoods.  Although the parties dispute whether this concern is a valid object of legislative action, the trial court concluded that it was.  In the alternative to its conclusion that the 3% cap did not represent a monopoly, the trial court held as follows:

> The Court further concludes that, even if the three percent cap constitutes a monopoly, the monopoly created would be a permissible monopoly.  The Anti-Monopoly Clause of the Tennessee constitution does not prohibit the granting of a monopoly if such monopoly "has a reasonable tendency to aid in the promotion of the health, safety, morals and well-being of the people." *Checker Cab Co. v. City of Johnson City*, 216 S.W.2d 335, 337 (1948).  Assuming the three percent cap creates a monopoly, the monopoly is not an

---

[7] Our ultimate conclusion regarding the validity of the cap would not be altered even if we assumed that we have erred in considering the 3% cap to be a monopoly.  As explained herein, because the cap has a reasonable tendency to promote the public's welfare by protecting the residential character of neighborhoods, it is constitutionally permitted.

[8] On two occasions, this Court has likened the standard to rational basis review. *See Dial-A-Page, Inc. v. Bissell*, 823 S.W.2d 202, 206-07 (Tenn. Ct. App. 1991); *Esquinance v. Polk Cnty. Educ. Ass'n*, 195 S.W.3d 35, 47 (Tenn. Ct. App. 2005).

[9] This recitation accompanied the original STRP ordinances and the new ordinance, Substitute Ordinance No. BL2016-492.

impermissible one because it has a reasonable tendency to further those goals. The alleged monopoly specifically furthers the well-being of Metro citizens because it balances the interest between the citizens who want to achieve benefits from renting their property on a short-term basis against the interest of citizens who want to protect the residential character of their neighborhoods.

While the Andersons argue that the protection of residential character is not a valid exercise of the police power, we disagree. We consider the protection of residential character to implicate a matter of the public's well-being, and we hold this opinion even to the extent that such protection might be considered to partially involve the promotion of an aesthetic consideration. As noted by our Supreme Court, there is a strong judicial trend toward sustaining exercise of the police power even when aesthetic considerations constitute the sole or primary reason for the legislation. *State v. Smith*, 618 S.W.2d 474, 477 (Tenn. 1981) ("[I]n modern society aesthetic considerations may well constitute a legitimate basis for the exercise of police power, depending upon the facts and circumstances.").

The 3% cap before us limits the number of single-family and two-family residential units that may be permitted as non-owner-occupied short-term rentals. The cap thus limits the ability of owners who do not permanently reside in their homes to transform their properties into havens for transient occupancy. When moving for summary judgment, Metro proffered a number of declarations from local residents in an attempt to illustrate why limiting non-owner-occupied short-term rentals was desirable. As one resident stated, "The reason we want limits on the non-owner-occupied houses on our street is the same reason you don't want to live in a hotel. There is an increased number [of] transient strangers, and there is [a] decreased sense of community." In expounding on this sense of community and the effect that the proliferation of non-owner-occupied short-term rentals had already had, the same resident stated:

> The residents of our street are fairly close-knit, and we form a community; this is one of the advantages and joys of living in Nashville. We chase each other[']s dogs when they get loose, drag each other[']s trash cans out to the curb when someone's out of town, take UPS packages out of the rain, and more. We watch over elderly neighbors and celebrate kids['] birthdays. We decorate our yards for holidays. (Christmas on Rudolph Avenue involves a lot of Rudolph-themed decorations!) But 20%[10] of the properties on our street are not part of this community. We have 20% fewer neighbors and 20% fewer decorated yards.

---

[10] According to this resident, 20% of the homes on her two-block street are non-owner-occupied short-term rentals.

In describing his experience with non-owner-occupied short-term rentals, another resident stated as follows: "[M]y children's friends have been replaced by bachelorette parties."

As Metro observed at summary judgment, even Mrs. Anderson expressed concern about living in a neighborhood "that's all short-term rentals." When discussing this in her deposition, she stated as follows:

> Well, most of the Airbnb guests are a lot more wonderful than some of the people that live in the neighborhood, but I just like the idea of knowing your neighbors. You know, if you need a loaf of bread or some milk, that you can go across the street. I mean, we don't have much -- all our houses are relatively small, so we spend a lot of time outside in the summer. We all talk and things like that.

> For the most part, I've really enjoyed getting to know all the Airbnb guests that I've gotten to know, but you wouldn't be able to develop those, like, long-time friendships if the whole neighborhood were that way.

There is clearly a concern within the community that the development of residential character is impacted negatively the more that single-family and two-family residential units are inhabited by transient occupants as opposed to permanent residents. As stated before, we are of the opinion that this concern is a valid object of municipal action. Attempting to preserve a sense of community and residential character is a matter of the public's well-being, and having examined the cap in question, we conclude that it has a reasonable tendency to promote this purpose.

Indeed, by limiting the number of one- and two-family residential units that may be used as non-owner-occupied short-term rentals, the cap clearly bears a legitimate relation to a valid end. By virtue of the cap, only a small percentage of these residential units may be used for non-owner-occupied short-term rentals. This ensures the overwhelming majority of single-family and two-family residential units are not occupied by transient occupants. As Metro argued in a paper filed in support of its motion for summary judgment, "If the Metro Council's aim was to prevent short-term rental properties with no long-term residents from overtaking residential neighborhoods, what could be more rational than capping these types of STRPs?" Because the cap has a reasonable tendency to aid in the protection of residential character and community, which we conclude is a matter of public well-being, there is no basis to declare it unlawful. Again, "[i]f in the exercise of . . . [the] police power an incidental monopoly happens to be created, it is not one which offends the anti-monopoly clause of our Constitution." *Landman*, 255 S.W.2d at 7 (citation omitted). The trial court's judgment is affirmed as it relates to this issue.

### *Attorney's Fees*

In this case, the Andersons asserted a number of federal constitutional claims pursuant to 42 U.S.C. § 1983. In connection with these claims, they also sought to recover attorney's fees under 42 U.S.C. § 1988. Section 1988 provides that "[i]n any action or proceeding to enforce a provision of [section 1983], the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). Although the trial court awarded the Andersons certain attorney's fees for their actions in the trial court pursuant to this authority, there is a dispute on appeal concerning whether they were entitled to fees, and if so, whether the fees awarded were proper.

As it concerns our discussion herein, only three of the Andersons' claims are of particular relevance: the constitutional "vagueness" claim under the Fourteenth Amendment; the First Amendment free speech claim; and the Fourth Amendment search and seizure claim. To recap, the Andersons were successful on their constitutional "vagueness" claim in the trial court when, following summary judgment, the trial court concluded that the STRP definition was unconstitutionally vague as-applied to them. With respect to their asserted free speech and search and seizure claims, the Andersons achieved some initial success when they were granted a preliminary injunction. However, following the passage of ordinances that amended portions of the Metro Code that the Andersons took issue with, these other claims were dismissed as moot.

When the Andersons sought attorney's fees in the trial court, they contended that they had achieved favorable results in more than one respect. In addition to highlighting their success "in having the STRP law's definitions declared unconstitutionally vague," the Andersons observed that they had "presented two claims that prevailed in an injunction." They argued that the results of the case warranted a "full award" of attorney's fees, and a declaration submitted by their attorney reflected that over $140,000.00 in attorney's fees had been incurred. Ultimately, the trial court did not award the Andersons the full amount that had been requested, but instead, it awarded approximately $103,000.00 in attorney's fees upon finding that the Andersons had prevailed on their Fourteenth Amendment "vagueness" claim.

For its part, Metro contends that no attorney's fees should have been awarded. It argues that the Andersons should not be considered "prevailing parties," and even if they are deemed to have prevailed, it submits that the amount of success obtained by them does not warrant the recovery of a fee. It also takes issue with the sufficiency of the trial court's findings, arguing that the trial court performed no analysis of the relevant factors to be considered when fashioning an award of fees. On the other hand, the Andersons submit that the trial court's award was insufficient. In pertinent part, they contend that the trial court erred in failing to consider that they had also prevailed on their free speech and search and seizure claims.

"A plaintiff must be a 'prevailing party' to recover an attorney's fee under § 1988." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). A party is considered "prevailing" upon proving any constitutional violation, even if only entitled to minimal relief. *Keith v. Howerton*, 165 S.W.3d 248, 251 (Tenn. Ct. App. 2004) (citing *Farrar v. Hobby*, 506 U.S. 103, 115 (1992)). Although ordinarily plaintiff's counsel will be entitled to full compensation for the time and effort expended in the representation when a plaintiff prevails on a civil rights claim, *id.* at 252 (citing *Hensley*, 461 U.S. at 435), in some circumstances, "even a plaintiff who formally 'prevails' under § 1988 should receive no attorney's fees at all." *Farrar v. Hobby*, 506 U.S. 103, 115 (1992). The amount of an appropriate fee must be determined on the facts of each case, *Hensley*, 461 U.S. at 429, and the determination of a reasonable attorney's fee is a discretionary inquiry. *Howerton*, 165 S.W.3d at 250-251 (citation omitted). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a clearly unreasonable decision that causes an injustice to the aggrieved party. *Id.* at 251 (citation omitted).

At the outset, we note that we do not agree with Metro's suggestion that an award of any attorney's fees was not permitted. Although Metro attempts to argue that the Andersons should not be considered prevailing parties with respect to their constitutional "vagueness" claim, we find this contention to be without merit. As we have already detailed, the trial court concluded at summary judgment that the STRP definition was unconstitutionally vague as-applied to the Andersons. At that time, therefore, the Andersons were not subject to the STRP ordinances. Although this no doubt yielded a significant result for the Andersons, Metro attempts to maintain that no real benefit was achieved. According to Metro, short-term rentals were not permitted prior to the STRP ordinances, and as such, Metro submits that the trial court's ruling produced merely a "symbolic victory." However, as we have already noted, Metro did not dispute at summary judgment that its Zoning Administrator had written an opinion in October 2014 stating that his department had construed STRPs to be an incidental subordinate use to a principal residential use. Moreover, Metro expressly stated in a sworn interrogatory response that "STRPs were not a Codes violation prior to the passage of the ordinance." The fact remains that the effect of the trial court's ruling rendered the prior STRP ordinances unenforceable against the Andersons. They were clearly "prevailing parties" on this account.[11]

---

[11] Although this Court previously noted that it is a "question of some difficulty" as to whether a plaintiff who obtained relief in the trial court could be considered a prevailing party when the case becomes moot while an appeal is pending, *see McIntyre v. Traughber*, 884 S.W.2d 134, 139 (Tenn. Ct. App. 1994) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 483 (1990)), many courts have answered this question as we have here. *See, e.g.*, *Diffenderfer v. Gomez-Colon*, 587 F.3d 445, 454 (1st Cir. 2009) ("When plaintiffs clearly succeeded in obtaining the relief sought before the district court and an intervening event rendered the case moot on appeal, plaintiffs are still 'prevailing parties' for the purposes of attorney's fees for the [trial court] litigation.").

With that said, it is somewhat unclear why the Andersons were awarded the amount of fees ordered by the trial court. We might surmise that the trial court gave an amount less than had been requested because it considered the Andersons to have prevailed on some claim(s), i.e., the vagueness claim, but not others. After all, the order does specifically mention that the Andersons "are the prevailing party . . . because the Court granted summary judgment on their Fourteenth Amendment 'vagueness' claim." However, on the whole, we are of the opinion that the order does not provide a sufficient account for our appellate review. As Metro has suggested, although the trial court "noted the correct standard" governing an award of fees,[12] the trial court did not give much indication as to how it weighed the relevant factors or what specifically informed its reasoning. In relevant part, the trial court's order on fees states as follows:

> After reviewing the relevant pleadings and considering arguments presented in this matter, the Court finds that the Plaintiffs are the prevailing party within the meaning of 42 U.S.C. § 1988 because the Court granted summary judgment on their Fourteenth Amendment "vagueness" claim.
>
> Having considered the degree of success, the Court, in awarding fees, considers a number of factors: the time devoted to performing the legal service; the time limitations imposed by the circumstances; the novelty and difficulty of the questions involved and the skill requisite to perform the legal services properly; the fee customarily charged in this locality for similar legal services; the amount involved; the results obtained; and the experience, reputation, abilities of the attorney performing the legal service.

---

[12] This statement was made in Metro's reply brief. In its initial brief, Metro had suggested that the trial court's order on attorney's fees reflected that it did not consider all the relevant factors:

> The Trial Court stated that it considered a number of factors in awarding attorney fees and costs: "the time devoted to performing the legal service; the time limitations imposed by the circumstances; the novelty and difficulty of the questions involved and the skill requisite to perform the legal services properly; the fee customarily charged in this locality for similar legal services; the amount involved; the results obtained; and the experience, reputation, [and] abilities of the attorney performing the legal service." Notably, the Trial Court's order contains no analysis of these factors, and the order does not state that the Trial Court even considered the relationship between the extent of success and the amount of the fee award as required[.]

As stated in this Opinion, we do not disagree with Metro that the trial court's order is virtually devoid of actual findings or analysis with respect to the factors it purportedly considered. However, the above statement from Metro's *initial* brief is imprecise as to the contents of the trial court's order on fees. In addition to the list of factors that Metro cites from the trial court's order, the trial court's order states that it "considered the degree of success."

> After considering these factors and the Declaration submitted by Plaintiffs' counsel, the Court hereby awards $103,000 in attorneys' fees and $1,304.36 in discretionary costs for a total award of $104,604.36.

Although the trial court's order states that it considered the above factors, we have no indication as to how it actually applied them, other than equating the Andersons' "degree of success" with the constitutional "vagueness" claim. We note that "[c]ourts are required to document their decision-making process in making or denying 1988 fee awards, and follow the guiding principles for doing so." *Whalen v. Hutchison*, No. E2001-01404-COA-R3-CV, 2002 WL 489558, at *2 (Tenn. Ct. App. Apr. 1, 2002). Both the trial court's findings and mode of analysis must be sufficiently clear to allow for intelligent appellate review. *Id.* (citation omitted). "It is this Court's purview to review, not assume or speculate. Without any facts in the trial court's order, we are forced to guess at the rational[e] the trial court used in arriving at its decision. This we cannot do." *Harthun v. Edens*, No. W2015-00647-COA-R3-CV, 2016 WL 1056960, at *5 (Tenn. Ct. App. Mar. 17, 2016); *see also Hensley*, 461 U.S. at 437 (stating that it remains important for the court "to provide a concise but clear explanation of its reasons for the fee award"). Because we would largely be forced to speculate how the trial court considered the relevant factors incident to its § 1988 award, we must vacate the trial court's award on attorney's fees and remand for reconsideration and further findings.

A remand is also necessitated, however, due to the one factor for which the trial court appeared to provide a finding. As we have noted, the trial court concluded that the Andersons were prevailing parties due to their success on the constitutional "vagueness" claim. The implication from the order seems to be that the trial court did not consider the Andersons to be prevailing parties concerning any other claims. We do not find favor in this conclusion but agree with the Andersons that they prevailed on their free speech and search and seizure claims for purposes of § 1988.

Although Metro opposes this notion and cites the decision in *Sole v. Wyner*, 551 U.S. 74 (2007), as a partial basis for its argument, *Sole* does not compel a result unfavorable to the Andersons' position. In that case, the United States Supreme Court held that "[a] plaintiff who achieves a transient victory at the threshold of an action can gain no award under [§ 1988] if, at the end of the litigation, her initial success is undone and she leaves the courthouse emptyhanded." *Id.* at 78. Importantly, however, it should be noted that the Supreme Court's holding was limited to a situation where the merits of the case were decided against the plaintiff notwithstanding her initial success. The Supreme Court emphasized that it "express[ed] no view on whether, in the absence of a final decision on the merits of a claim for permanent injunctive relief, success in gaining a preliminary injunction may sometimes warrant an award of counsel fees." *Id.* at 86.

Subsequent decisions in the federal courts have attempted to tackle the question left unaddressed in *Sole*. From our research, it does not appear that the federal courts

have uniformly employed the same analysis governing when a preliminary injunction might confer prevailing party status. Nonetheless, we note that there are several decisions that suggest that the preliminary injunction obtained in this case would be sufficient, when considered independently, to confer such status on the Andersons. *See, e.g.*, *Higher Taste, Inc. v. City of Tacoma*, 717 F.3d 712, 717 (9th Cir. 2013) (noting that courts have held that a plaintiff is a prevailing party for purposes of § 1988 when the plaintiff "wins a preliminary injunction prohibiting enforcement of a particular statute, and the defendant renders the case moot by repealing the statute before final judgment is entered"). Consider, for instance, the decision in *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009), in which several organizations and voters filed a complaint challenging a Georgia photo identification act. Although the plaintiffs were successful in obtaining a preliminary injunction barring enforcement of the challenged law, the law was repealed and replaced with a new statute. *Id.* at 1346. Further proceedings were held regarding the new statute following the filing of an amended complaint, but the trial court ultimately awarded the plaintiffs attorney's fees for challenging the earlier statute. *Id.* at 1349. Among the issues on appeal was whether the trial court erred in determining that the plaintiffs were prevailing parties with respect to their challenge of the prior legislation. In affirming that the plaintiffs were prevailing parties entitled to fees, the Eleventh Circuit held as follows:

> "The touchstone of the prevailing party inquiry ... is the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Sole v. Wyner*, 551 U.S. 74, 127 S.Ct. 2188, 2194, 167 L.Ed.2d 1069 (2007) (internal quotation marks omitted). This Court has interpreted this language to require either "(1) a situation where a party has been awarded by the court at least some relief on the merits of his claim or (2) a judicial imprimatur on the change in the legal relationship between the parties." *Smalbein ex rel. Estate of Smalbein v. City of Daytona Beach*, 353 F.3d 901, 905 (11th Cir.2003) (per curiam) (internal quotation marks omitted) (emphasis omitted). We have stated that "a preliminary injunction on the merits ... entitles one to prevailing party status and an award of attorney's fees." *Taylor v. City of Fort Lauderdale*, 810 F.2d 1551, 1558 (11th Cir.1987).

> . . . .

> The NAACP and voters are prevailing parties because the preliminary injunction they obtained materially altered their legal relationship with the election officials. The injunction prevented Georgia from enforcing the requirement of photo identification for in-person voting. That injunction remained effective until Georgia repealed the law at issue.

- 19 -

Georgia argues that the decision of the district court not to enjoin the current statute vitiated the earlier victory of the NAACP and voters, but we disagree. Georgia relies on the rule that "[p]revailing party status ... does not attend achievement of a preliminary injunction that is reversed, dissolved, or otherwise undone by the final decision in the same case," *Sole*, 127 S.Ct. at 2195, but that rule is inapplicable. As the district court explained, the preliminary injunction against the earlier statute was not "reversed, dissolved, or otherwise undone" by any judicial decision. Georgia instead repealed the enjoined statute.

*Id.* at 1356.

In another case, the Tenth Circuit has suggested that two principles should guide our inquiry in this context:

First, and most fundamental, in order for a preliminary injunction to serve as the basis for prevailing-party status, the injunction must provide at least some relief on the merits of the plaintiff's claim(s). A preliminary injunction provides relief on the merits when it (a) affords relief sought in the plaintiff's complaint and (b) represents an unambiguous indication of probable success on the merits.

. . . .

Second, if a preliminary injunction satisfies the relief-on-the-merits requirement, the plaintiff qualifies as a "prevailing party" even if events outside the control of the plaintiff moot the case. If, however, the preliminary injunction is undone by a subsequent adverse decision on the merits, the plaintiff's transient success in obtaining the injunction does not render the plaintiff a "prevailing party."

*Kansas Judicial Watch v. Stout*, 653 F.3d 1230, 1238 (10th Cir. 2011).

In light of the above considerations, we are of the opinion that the Andersons should also have been considered prevailing parties due to their free speech and search and seizure claims. The trial court found that they had demonstrated "a substantial likelihood of success on the merits" with respect to both of these claims, and it accordingly entered an injunction concerning the challenged ordinance requirements and restrictions. Although these claims were ultimately dismissed, they were not resolved adversely on the merits. Litigation over these claims ended on account of mootness. Mootness, of course, had been established by the passage of new Metro ordinances that altered the previous requirements and restrictions under scrutiny.

In summary, due to the insufficiency of the trial court's findings in its award on fees and its apparent conclusion that the Andersons only "prevailed" on their "vagueness" claim, we vacate the trial court's award on fees and remand the matter for reconsideration. Although we are remanding the case for a reconsideration of the attorney's fee award, we do so only with respect to work performed in the trial court. Although it is somewhat unclear, the Andersons' principal brief appears to request to recover fees incident to this appeal. Assuming that this is, in fact, their position, we do not find merit in it. Aside from the fact that the Andersons do not request appellate attorney's fees in their "Statement of the Issues," we observe that they have not prevailed on any justiciable federal constitutional claims in this appeal.

## CONCLUSION

In light of the foregoing, we do not address the merits of the Andersons' constitutional "vagueness" claim, as that matter is now moot. With respect to the 3% cap on non-owner-occupied short-term rentals, we have determined that the cap is constitutionally permissible even assuming that it constitutes a monopoly. We do, however, vacate the trial court's award of attorney's fees and remand the matter for reconsideration in light of our discussion herein. Costs of this appeal are assessed as follows: one-half against the Appellant, the Metropolitan Government of Nashville and Davidson County, and one-half against the Appellees, Rachel Anderson and P.J. Anderson, and their surety. Execution for costs may issue if necessary. This case is remanded to the trial court for the collection of costs, enforcement of the judgment, and for such further proceedings as may be necessary and consistent with this Opinion.

_____
ARNOLD B. GOLDIN, JUDGE